**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No.  11-cv-03249-WYD-CBS

SHEEP MOUNTAIN ALLIANCE, a Colorado non-profit corporation,

   Plaintiff,

v.

PACIFICORP, an Oregon corporation,

   Defendant.

---

## CONSENT DECREE

---

   WHEREAS, the Plaintiff, Sheep Mountain Alliance ("Plaintiff" or "SMA"), initiated the above-captioned action (the "Lawsuit") by filing a Complaint (ECF No. 1) on December 12, 2011, against PacifiCorp ("Defendant" or "PacifiCorp"), alleging violations of the Federal Water Pollution Control Act, 33 U.S.C. § 1251 *et seq.* (hereinafter, the "Clean Water Act"), and seeking declaratory and injunctive relief, civil penalties, and attorneys' and expert witness fees and costs;

   WHEREAS, SMA's claims and this Consent Decree relate to the Silver Bell Tailings Impoundment (the "Impoundment"), a former mill tailings disposal site located south of Telluride, Colorado, on the west side of the Ophir Loop on Colorado State Highway 145, about one-quarter mile west of the turnoff to the town of Ophir, Colorado, as depicted in Figure 1;

WHEREAS, PacifiCorp denies SMA's claims, allegations, and any liability for the alleged violations;

WHEREAS, SMA and PacifiCorp (collectively referred to as the "Parties" and each singularly as a "Party") agree that settlement of this matter is in the best interest of the Parties and the public, and that entry of this Consent Decree without additional litigation is the most appropriate means of resolving this Lawsuit; and

WHEREAS, SMA and PacifiCorp, after consultation with their respective counsel and without trial or final adjudication of the issues of fact or law with respect to SMA's claims or allegations, consent to the entry of this Consent Decree in order to avoid the risks of litigation and to resolve the controversy between them;

NOW, THEREFORE, upon the consent of the Parties, and upon consideration of the mutual promises herein contained, it is hereby ORDERED, ADJUDGED, AND DECREED as follows:

<u>General Provisions</u>

1.     This Court has jurisdiction over the Parties and the subject matter of this Lawsuit pursuant to 33 U.S.C. § 1365(a) and 28 U.S.C. § 1331.  Venue is proper in this Court pursuant to 33 U.S.C. § 1365(c), and 28 U.S.C. §§ 1391(b) and 1395(a).  This Court shall have continuing jurisdiction over this Lawsuit for the purposes of interpretation, enforcement, and, if necessary, modification of this Consent Decree.

2.     The undersigned representative for each Party certifies that he/she is fully authorized by the Party whom he/she represents to enter into the terms and conditions of this Consent Decree and to legally bind the Party to it.

3.      This Consent Decree shall apply to and be binding upon the Parties to this

Lawsuit, and upon all successors and assigns of the Parties.  Any entity that purchases

the Impoundment shall be subject to the terms of this Consent Decree, unless otherwise

agreed by the Parties through a modification to this Consent Decree under Paragraph

24.  PacifiCorp, and any of its successors or assigns, may sell the Impoundment without

SMA's consent and without approval by the Court.  Until this Consent Decree is

terminated, notice of any sale must be provided to SMA.

Site Inspections &amp; Record Keeping

4.      For the duration of this Consent Decree, representatives of SMA shall be allowed

to inspect the Impoundment up to twice per year, unless otherwise agreed by the

Parties.  SMA shall be allowed to designate up to three individuals to take part in any

inspection of the Impoundment.  Prior to conducting any inspection of the Impoundment,

SMA representatives shall sign any reasonable waiver or release document presented

by PacifiCorp, which releases PacifiCorp from all liability for any injury, loss, or damage

SMA's representatives may incur during any inspection that is not the result of

negligence by PacifiCorp.  Unless expressly waived by PacifiCorp in writing, SMA's

representatives shall be accompanied by representatives of PacifiCorp during any site

inspection.

5.      SMA shall provide at least fourteen (14) days prior written notice to PacifiCorp of

its desire to inspect the Impoundment under Paragraph 4, unless otherwise agreed by

the Parties.  Any inspection shall be scheduled for a date and time that PacifiCorp and

SMA determine is mutually agreeable.

6.      For the duration of this Consent Decree, PacifiCorp shall provide to SMA, at

SMA's request and at no cost to SMA, either hard or electronic copies of any reports,

correspondence, or other documents provided to Water & Environmental Technologies

("WET"), WET's contractors, or state or other regulatory agencies relating to the

Adaptive Management Plan described in Paragraphs 7–14 of this Consent Decree.

WET was jointly chosen by the Parties to develop and implement the Adaptive

Management Plan.  Accordingly, PacifiCorp may not withhold from production to SMA

any documents provided to WET concerning the work related to this Consent Decree.

PacifiCorp may withhold from production to SMA any document that is protected under

any evidentiary privilege or production immunity, including but not limited to the

attorney-client privilege and work-product immunity.  If PacifiCorp asserts that a

document is immune from production to SMA, PacifiCorp shall provide to SMA, in the

form of a privilege log, a description of the nature of the documents withheld in a

manner that, without revealing privileged or protected information, will enable SMA to

assess for itself whether the privilege is being properly asserted.

Adaptive Management Plan

7.      PacifiCorp shall implement an Adaptive Management Plan at the Impoundment,

as described below.  This Adaptive Management Plan has been designed by each

Party's respective experts in collaboration and in consultation with David Erickson of

WET.  For the purposes of the Adaptive Management Plan, each Party agrees to be

bound by the final opinions and conclusions of WET as to any of the requirements set

out below.  PacifiCorp agrees to contract exclusively with WET for completion of all

-4-

tasks required by the Adaptive Management Plan, except that PacifiCorp, with WET's prior approval, may engage, at the direction and under the oversight of WET, any necessary subcontractor to carry out the Adaptive Management Plan.

8.      PacifiCorp shall be responsible for all fees and costs incurred in undertaking the Adaptive Management Plan, including compensating WET.

9.      The target start date for Tasks 1–3, as set out below, shall be no later than June 15, 2013. If the Impoundment is not safely accessible by June 15, 2013, by non-winterized vehicles via the United States Forest Service access road to the Impoundment from Colorado State Highway 145 (the "Access Road"), however, then Tasks 1–3 will commence as soon as the Impoundment is safely accessible by non-winterized vehicles via the Access Road.  If the target start date is delayed, PacifiCorp shall promptly notify SMA in writing of such delay and include a new projected start date.

10.     *Adaptive Management Plan Task One—Double Ring Infiltrometer Testing:*

        a.      PacifiCorp shall complete the Double Ring Infiltrometer Test, as described in WET's Investigation Work Plan (attached hereto as Exhibit A) and Attachment A to the Investigation Work Plan.

        b.      The data obtained from the Double Ring Infiltrometer Test shall be used to determine the in-place permeability of the current evapotranspiration cap on the Impoundment.

11.    *Adaptive Management Plan Task Two—Lysimeter Installation:*

a.    PacifiCorp shall complete lysimeter installation at three locations on the Impoundment, as depicted in Figure 1 of Exhibit A attached hereto.

b.    The lysimeters will provide for direct measurement of moisture transmission through the current evapotranspiration cap of the Impoundment. Data from the lysimeters, along with data from a solar-powered weather station at the Impoundment, shall be collected monthly.

c.    The Parties anticipate that Task Two shall be completed by October 31, 2014; however, the Parties acknowledge that completion of Task Two will depend upon the quality of the data obtained from the lysimeters and the weather station, and that additional monitoring may be required to generate useable data.

12.    *Adaptive Management Plan Task Three—Ground-Penetrating Radar:*

a.    PacifiCorp shall complete a geophysical survey along the southeast edge of the Impoundment using ground-penetrating radar.  The purpose of Task Three is to map the bedrock surface and the thickness of the tailings or unconsolidated sediments in the Impoundment.  Piezometer data will be used to determine the saturated thickness of any unconsolidated sediments that are found.

b.    If, in the opinion of WET's David Erickson, the data collected during the ground-penetrating radar and piezometer study indicate that groundwater is flowing into the tailings in the Impoundment, then slug tests will be conducted using nearby piezometers to (a) determine the permeability of the saturated

zone, and (b) allow WET to perform a flux calculation to determine the volume of groundwater entering the Impoundment.

c.      PacifiCorp shall excavate test pits on the upgradient side of the Impoundment's stormwater control ditches in areas of possible bedrock troughs to collect data on soil type, saturation, and depth to bedrock.  These data, along with ground-penetrating radar survey and piezometer data, shall be used to determine if saturation is present beneath the stormwater control ditches.

13.     *Task Four—Cap Modification Modeling:*

a.      Upon completion of Tasks One through Three, PacifiCorp shall model the performance of the current evapotranspiration cap using an unsaturated flow model designed specifically for evapotranspiration caps.

b.      Once the model has been calibrated to present conditions at the Impoundment as reflected by the data collected and analyzed in Tasks One through Three, PacifiCorp shall evaluate the following alternatives for improving the current evapotranspiration cap:  (1) installation of a new low-permeability clay cap; (2) provision of additional cover thickness; (3) construction of additional slope from the top of the tailings pile; and (4) adding a geomembrane clay liner ("GCL").  PacifiCorp also may evaluate other alternatives to improving the evapotranspiration cap and the effect a combination of alternatives will have on improving the current evapotranspiration cap.

c.      PacifiCorp shall begin implementation of Task Four as soon as reasonably practicable, but in any event no later than December 31, 2014; provided,

however, that if Tasks One through Three have not been completed by December 31, 2014, then PacifiCorp shall begin implementation of Task Four within fourteen (14) days after Tasks One through Three have been fully completed.

14.   *Task Five—Report and Recommendation:*

a.      Within sixty (60) days of the date of completion of Task Four, WET shall prepare a "Report and Recommendation" documenting the findings from Tasks One through Four.  The "Report and Recommendation" shall include:

      i.      A complete water-balance equation, with all parameters defined and described for the site-specific conditions of the Impoundment;

      ii.      A detailed description of the modeling assumptions and results;

      iii.      Recommendations for upgrade(s) to the existing evapotranspiration cap, along with cap options and corresponding performance estimates;

      iv.      An estimate of the amount of time required to drain the Impoundment if the recommended modifications to the cap are implemented;

      v.      An estimate of the seepage rate over time resulting from implementation of the recommended modifications; and,

      vi.      A calculation of the expected rate of discharge and expected concentration of the effluent parameters for which effluent limitations have been established in PacifiCorp's Colorado

Discharge Permit System permit (Permit No. CO-0046931)

("Permit") as of the time the "Report and Recommendation" is

prepared at the following locations:

1.      At a location above Outfall 001 (as defined in the Permit),

upstream of any component of the water-treatment system

associated with Outfall 001; and

2.      At Outfall 002 (as defined in the Permit).

This calculation is hereinafter referred to as the Effluent Parameter

Discharge Calculation.

b.      PacifiCorp shall install the upgrade(s) recommended in WET's "Report

and Recommendation" if David Erickson concludes with a high degree of

confidence that installation of the upgrade(s) will decrease the amount of

water infiltrating into the Impoundment such that the Effluent Parameter

Discharge Calculation for all effluent parameters results in values below

the discharge limits established in the Permit as of the date on which WET

completes the "Report and Recommendations."

c.      PacifiCorp shall begin implementation of the upgrade(s) required by

subparagraph (b), if any, as soon as the Impoundment is safely accessible

by non-winterized vehicles via the Access Road after WET completes the

"Report and Recommendations," provided, however, that if PacifiCorp,

with reasonable diligence, is unable to secure all permits and

governmental approvals necessary to perform the upgrade(s) by that date,

then PacifiCorp shall begin implementation of the upgrade(s) as soon as reasonably practicable after PacifiCorp has obtained all such permits and approvals.

15.     If at any time the total cost incurred by PacifiCorp to undertake Tasks One through Four of the Adaptive Management Plan (as described in Paragraphs 9–12 of this Consent Decree) is projected to exceed $100,000, PacifiCorp and SMA agree to evaluate and confer in good faith regarding whether to proceed to upgrade the evapotranspiration cap or implement other improvements at the Impoundment, without further analysis and evaluation provided for by Tasks One through Four of the Adaptive Management Plan.  Furthermore, SMA believes that the best approach to reduce discharges from the Impoundment is to install a geosynthetic clay liner ("GCL") cap on the Impoundment.  Should PacifiCorp decide to install a GCL cap at any time prior to completing Tasks 1–5, PacifiCorp shall so inform SMA.  If such a decision is reached by PacifiCorp, Task 3 shall still be completed and any recommendations concerning groundwater infiltration shall be considered and adopted as necessary according to the Effluent Parameter Discharge Calculation to achieve the discharge limits in the Permit (as set forth in the Permit effective as of the date of the decision to install a GCL cap).

### Supplemental Environmental Project

16.     Within forty-five (45) days from the date this Consent Decree is entered by the Court, PacifiCorp shall pay the San Miguel Watershed Coalition $150,000 toward the supplemental environmental project ("SEP") related to improvement of water quality within the San Miguel River watershed as identified in Exhibit B, attached hereto.  At no

time shall PacifiCorp be required to fund a SEP that would cause PacifiCorp to manage or administer the SEP in any manner or become legally responsible in any way for any remediation or other tasks occurring at the SEP, or for any other liability whatsoever. PacifiCorp's only involvement in the SEP shall be the payment of funds as expressed herein.  Should the project identified in Exhibit B not proceed, the funds to be paid by PacifiCorp shall be placed in escrow, on such terms and conditions to be determined and agreed to by the Parties, until such time as the Parties agree on an alternative SEP, or SEPs, within the San Miguel River Watershed.

### Payment of Legal Expenses

17.     Within twenty (20) days from the date this Consent Decree is entered by the Court, PacifiCorp shall pay for SMA's attorneys' and consultation fees and costs incurred in association with this Lawsuit, in the amount of $250,000.  PacifiCorp shall pay such attorneys' and expert consultation fees and costs to the Law Offices of Charles M. Tebbutt, P.C.  SMA's attorneys and experts shall be solely responsible for any taxes that may be applicable to such fees and costs.

### Force Majeure

18.     A "Force Majeure Event" shall mean an event that has been or will be caused by circumstances beyond the control of PacifiCorp, its contractors, or any entity controlled by PacifiCorp, or WET, its contractors, or any entity controlled by WET, that delays or prevents performance of any provision of this Consent Decree despite the best efforts of PacifiCorp, its consultants, or any entity controlled by PacifiCorp, to fulfill the obligation. "Best efforts to fulfill the obligation" include using due diligence to anticipate any

potential Force Majeure Event and to address the effects of any such event (a) as it is occurring and (b) after it has occurred, such that the delay or non-compliance is minimized to the greatest extent possible. Failure of a permitting authority to issue a necessary permit in a timely fashion may constitute a Force Majeure Event where PacifiCorp has taken all reasonable actions to obtain the permit by the time necessary to comply with any applicable deadlines established in this Consent Decree. Such delay in or failure of performance occasioned by a Force Majeure Event shall not be deemed a violation of this Consent Decree.

19.     If any event occurs or has occurred that may delay or prevent performance of any obligation under this Consent Decree as to which PacifiCorp intends to assert a claim of Force Majeure, PacifiCorp shall notify SMA in writing as soon as practicable, but in no event later than ten (10) business days following the date PacifiCorp first knew of the claimed Force Majeure Event. In this notice, PacifiCorp shall describe the anticipated length of time that the delay or prevention of performance may persist, the cause or causes of the delay or prevention of performance, all measures taken or to be taken by PacifiCorp to prevent or minimize the delay or prevention of performance, the schedule by which PacifiCorp proposes to implement those measures, and PacifiCorp's rationale for attributing a delay or prevention of performance to a Force Majeure Event.

20.     SMA shall notify PacifiCorp in writing if it does not accept PacifiCorp's claim of Force Majeure within ten (10) days of receipt of the notice asserting the claim provided under Paragraph 18. Failure by SMA to provide such timely notice shall be deemed acceptance of the asserted Force Majeure claim. If the Parties agree that a delay in

performance has been or will be caused by a Force Majeure Event, the Parties shall stipulate to an extension of deadline(s) for performance of the affected compliance requirement(s). In such circumstances, an appropriate modification shall be made pursuant to Paragraph 24.

21.     If SMA does not accept PacifiCorp's claim of Force Majeure, or if SMA and PacifiCorp cannot agree on the length of the delay actually caused by the Force Majeure Event, the matter shall be resolved in accordance with Paragraph 25.

Resolution of Claims

22.     This Consent Decree constitutes the exclusive remedy and final resolution between PacifiCorp and SMA, along with its members, officers, or directors, for all alleged violations of the Clean Water Act set forth in the Complaint and sixty-day notices of intent to sue sent by SMA to PacifiCorp on October 11, 2011 and January 13, 2012 (attached hereto as Exhibits C and D, respectively) ("60-Day Notices") that may have occurred or that could have been raised prior to the entry of this Consent Decree.

23.     SMA releases and covenants not to sue PacifiCorp, and its directors, officers, employees, and agents, with respect to any claims under the Clean Water Act or any other federal or state law or regulation that were or could have been brought in this lawsuit arising from any act or omission by PacifiCorp in regard to the Impoundment that occurred before the date the Court enters this Consent Decree. This release and covenant not to sue includes all such claims, whether known or unknown, asserted or unasserted, and specifically includes claims for damages, civil penalties, attorneys' fees and costs, expert consultant and witness fees, and injunctive relief.

24.     Within five (5) days following entry of this Consent Decree by the Court, SMA shall withdraw its pending administrative challenge to the Permit before the Colorado Department of Public Health and Environment ("CDPHE"), including SMA's request under Colorado Water Quality Control Commission Regulations 61.7(a) and 21.4(B) for an adjudicatory hearing in regard to the Permit.  From the date this Consent Decree is entered and until it is terminated, SMA further covenants not to initiate, commence, finance, or participate in any administrative, judicial, or other action to challenge the validity, terms, or any other aspect of the Permit.

### Modification

25.     Modifications to this Consent Decree may be made only upon written agreement of the Parties.  Material modifications shall be effective only upon approval by the Court. Extension by mutual agreement of the Parties of any deadline under this Consent Decree by not more than sixty (60) days is not a material modification and does not require Court approval.

### Dispute Resolution

26.     In the event of any dispute regarding implementation, interpretation, application, or compliance with this Consent Decree, the Parties shall first attempt to informally resolve that dispute through meetings of the Parties.  Any Party may initiate this informal dispute resolution process by serving written notice of a request for dispute resolution on the other Party.  If no resolution is reached within thirty (30) days from the date that the notice of a request for dispute resolution is served, then the Parties may resolve the dispute by filing motions with the Court.

<u>Termination</u>

27.    This Consent Decree shall terminate upon the first occurrence of any of the following:  (1) completion of the Adaptive Management Plan, including installation of upgrades, if any, recommended in WET's "Report and Recommendation"; or, (2) dissolution of this Consent Decree by the Court.

<u>Miscellaneous Provisions</u>

28.    By entering into the Consent Decree, the Parties are not admitting any fact or conclusion of law, and this Consent Decree shall not constitute an admission, statement, or evidence of any fact, wrongdoing, misconduct, or liability on the part of PacifiCorp, its owners, officers, agents, consultants, or affiliated entities.

29.    The Parties recognize that no consent judgment can be entered in a Clean Water Act suit in which the United States is not a party prior to forty-five (45) days following the receipt of a copy of the proposed Consent Decree by the Attorney General of the United States and the Administrator of the Environmental Protection Agency pursuant to 33 U.S.C. § 1365(c)(3).  Upon execution of this Consent Decree by the Parties, SMA shall serve copies of the executed Consent Decree upon the Administrator of the United States Environmental Protection Agency, the Attorney General, and the Regional Administrator for EPA Region 8, and SMA shall provide notice to the Court of the foregoing requirements, all as required pursuant to 40 C.F.R. § 135.5.

30.    This Consent Decree constitutes the final, complete, and exclusive agreement and understanding of the Parties with respect to the settlement embodied in this Consent Decree and the subject matter of the Lawsuit.  The Parties hereby

acknowledge that there are no representations or understandings relating to the Lawsuit or its settlement other than those expressly contained in this Consent Decree.

31.     The Parties agree to share any press releases regarding this Consent Decree, settlement of this Lawsuit, or any other matter related thereto on or before the business day prior to issuing such release solely for the purpose of providing the other Party with notice and a copy of the press release.

32.     In the event that any part of this Consent Decree is deemed by a court of competent jurisdiction to be unlawful, void, or for any reason unenforceable, and if that part is severable from the remainder of the Consent Decree without frustrating its essential purpose, then the remaining parts of this Decree shall remain valid, binding, and enforceable.

33.     Each Party acknowledges and represents that it has relied on the legal advice of its attorneys, who are the attorneys of its own choice, and that the terms of this Consent Decree have been completely explained to the Party by its attorneys, and that the terms are fully understood and voluntarily accepted.  SMA has been represented by Charles M. Tebbutt and Daniel C. Snyder of the Law Offices of Charles M. Tebbutt, P.C. PacifiCorp has been represented by Andrew C. Lillie and Aaron M. Paul of Hogan Lovells US LLP.

34.     If for any reason the Court should decline to approve this Consent Decree in the form presented, then the Parties agree to continue negotiations in good faith in an attempt to cure any objection raised by the Court to entry of this Decree.

35.     This Consent Decree may be signed in counterparts, and such counterpart

signature page shall be given full force and effect.

Notices

36.     Whenever notice is required to be given or a document is required to be sent by

one Party to another under the terms of this Consent Decree, it will be directed to the

individuals at the addresses specified below, unless prior notice of a change has been

given to the other Party.  A notice is sufficient under this Consent Decree if it is provided

in writing through U.S. mail, hand-delivered, or provided electronically by e-mail with

proof of delivery receipt certificate requested.  If notice is provided via U.S. mail, it shall

be considered effective upon the date of mailing.

For Plaintiff SMA:

Charles M. Tebbutt
Daniel C. Snyder
Law Offices of Charles M. Tebbutt, P.C.
941 Lawrence St., Eugene OR  97401
Tel: (541) 344-3505
Fax: (541) 344-3516
charlie.tebbuttlaw@gmail.com
dan.tebbuttlaw@gmail.com

And to:

Hilary Cooper
Director, Sheep Mountain Alliance
P.O. Box 389
Telluride, CO 81435
Tel: (970) 728-3729
Fax: (970) 239-4989
Hilary@sheepmountainalliance.org

For Defendant PacifiCorp:

Andrew C. Lillie

Aaron M. Paul
Hogan Lovells US LLP
One Tabor Center, Suite 1500
1200 Seventeenth Street
Denver, CO  80202
Tel: (303) 899-7300
Fax: (303) 899-7333
andrew.lillie@hoganlovells.com
aaron.paul@hoganlovells.com

And to:

Michael G. Jenkins
PacifiCorp Energy
1407 West North Temple, Suite 320
Salt Lake City, Utah  84121
michael.jenkins@pacificorp.com

Effective Date

37.     The effective date of this Consent Decree shall be the date upon which the Clerk

enters in the civil docket a copy of this Consent Decree signed by the Court.

Final Judgment

38.     Upon approval and entry of this Consent Decree by the Court, this Consent

Decree shall constitute a final judgment of the Court under Rules 54 and 58 of the

Federal Rules of Civil Procedure.

WE HEREBY CONSENT to the Entry of this Consent Decree

   Dated:  May 24, 2013

                        BY THE COURT:


                        s/ Wiley Y. Daniel
                        **WILEY Y. DANIEL,**
                        **Senior United States District Court Judge**

**For Plaintiff Sheep Mountain Alliance:**

Signature: s/ Hilary Cooper_____

Name: Hilary Cooper

Position: Executive Director, Sheep Mountain Alliance

Date: March 18, 2013_____

**For Defendant PacifiCorp:**

Signature: s/ Dean Brockbank_____

Name:  Dean Brockbank

Position: General Counsel

Date: March 15, 2013_____