## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 11-cv-03249-WYD-CBS

SHEEP MOUNTAIN ALLIANCE, a Colorado non-profit corporation,

      Plaintiff,

v.

PACIFICORP, an Oregon corporation,

      Defendant.

### <u>AMENDED</u> CONSENT DECREE

WHEREAS, the Plaintiff, Sheep Mountain Alliance ("Plaintiff" or "SMA"), initiated the above-captioned action (the "Lawsuit") by filing a Complaint (ECF No. 1) on December 12, 2011, against PacifiCorp ("Defendant" or "PacifiCorp"), alleging violations of the Federal Water Pollution Control Act, 33 U.S.C. § 1251 *et seq.* (hereinafter, the "Clean Water Act"), and seeking declaratory and injunctive relief, civil penalties, and attorneys' and expert-witness fees and costs;

WHEREAS, SMA's claims and this Amended Consent Decree relate to the Silver Bell Tailings Impoundment (the "Impoundment"), a former mill tailings disposal site located south of Telluride, Colorado, on the west side of the Ophir Loop on Colorado State Highway 145, about one-quarter mile west of the turnoff to the town of Ophir, Colorado;

WHEREAS, PacifiCorp denies SMA's claims, allegations, and any liability for the alleged violations;

WHEREAS, SMA and PacifiCorp, after consultation with their respective counsel and without trial or final adjudication of the issues of fact or law with respect to SMA's claims or

allegations, consented to the entry of a Consent Decree in order to avoid the risks of litigation and to resolve the controversy between them;

WHEREAS, the Court approved and entered the Consent Decree on May 24, 2013 (ECF No. 42);

WHEREAS, the Parties have implemented the terms of that Consent Decree, including Tasks One–Three of the "Adaptive Management Plan," Paras. 10–13 of the Decree;

WHEREAS, PacifiCorp has represented to SMA that it intends to place a "Cover System," including a geosynthetic clay liner, over the top of the Impoundment during the summer and fall of 2015;

WHEREAS, SMA agrees with PacifiCorp that installation of the Cover System negates further implementation of the original Consent Decree's Adaptive Management Plan;

WHEREAS, based on the foregoing, the Parties have jointly filed a motion requesting the Court to set aside the original Consent Decree (ECF No. 42) and replace it with this Amended Consent Decree;

NOW, THEREFORE, upon the consent of the Parties, and upon consideration of the mutual promises herein contained, it is hereby ORDERED, ADJUDGED, AND DECREED as follows:

### General Provisions

1.    This Court has jurisdiction over the Parties and the subject matter of this Lawsuit pursuant to 33 U.S.C. § 1365(a) and 28 U.S.C. § 1331. Venue is proper in this Court pursuant to 33 U.S.C. § 1365(c), and 28 U.S.C. §§ 1391(b) and 1395(a). This Court shall have continuing

jurisdiction over this Lawsuit for the purposes of interpretation, enforcement, and, if necessary, modification of this Amended Consent Decree.

2.     The undersigned representative for each Party certifies that he/she is fully authorized by the Party whom he/she represents to enter into the terms and conditions of this Amended Consent Decree and to legally bind the Party to it.

3.     This Amended Consent Decree shall apply to and be binding upon the Parties to this Lawsuit, and upon all successors and assigns of the Parties. Any entity that purchases the Impoundment shall be subject to the terms of this Amended Consent Decree, unless otherwise agreed by the Parties through a modification to this Amended Consent Decree under Paragraph 24. PacifiCorp, and any of its successors or assigns, may sell the Impoundment without SMA's consent and without approval by the Court. Until this Amended Consent Decree is terminated, notice of any sale must be provided to SMA.

### Site Inspections & Record Keeping

4.     For the duration of this Amended Consent Decree, representatives of SMA shall be allowed to inspect the Impoundment up to twice per year, unless otherwise agreed by the Parties. SMA shall be allowed to designate up to three individuals to take part in any inspection of the Impoundment. Prior to conducting any inspection of the Impoundment, SMA representatives shall sign any reasonable waiver or release document presented by PacifiCorp, which releases PacifiCorp from all liability for any injury, loss, or damage SMA's representatives may cause or incur during any inspection that is not the result of negligence by PacifiCorp. Unless expressly waived by PacifiCorp in writing, SMA's representatives shall be accompanied by representatives of PacifiCorp during any site inspection.

5.      SMA shall provide at least fourteen (14) days' prior written notice to PacifiCorp of its

desire to inspect the Impoundment under Paragraph 4, unless otherwise agreed by the Parties.

Any inspection shall be scheduled for a date and time that PacifiCorp and SMA determine is

mutually agreeable.

6.      PacifiCorp hereby agrees to provide to SMA, at SMA's request and at no cost to SMA,

either hard or electronic copies of any reports, correspondence, or other documents related to this

Amended Consent Decree, the Impoundment, and the Cover System. PacifiCorp may withhold

from production to SMA any document that is protected under any evidentiary privilege or

production immunity, including but not limited to the attorney-client privilege and work-product

doctrine. If PacifiCorp asserts that a document is immune from production to SMA, PacifiCorp

shall provide to SMA, in the form of a privilege log, a description of the nature of the documents

withheld in a manner that, without revealing privileged or protected information, will enable

SMA to assess for itself whether the privilege is being properly asserted. The requirements of this

Paragraph shall continue until December 31, 2020, notwithstanding the termination of this

Amended Consent Decree. The Court shall retain limited jurisdiction, notwithstanding the

termination of this Amended Consent Decree, for the purposes of interpreting and enforcing this

Paragraph.

### Installation of Cover System

7.      In accordance with the Cover Construction Work Plan dated April 1, 2015 (attached

hereto as Exhibit A), and in concert with the Development Permit Application – Addendum

(attached hereto as Exhibit B), PacifiCorp shall install a "Cover System," including a

Geosynthetic Clay Liner ("GCL"), over the entire top of the Impoundment. Construction of the

Cover System is scheduled to be complete by December 31, 2015. Installation of the Cover

System will proceed as follows: (1) removal of the topsoil from the existing cover; (2) preparation of the subgrade for GCL placement; (3) placement of the GCL; and (4) replacement of the topsoil. Topsoil removed from the surface in the initial step may be screened to remove coarse material so that it can be placed directly on the GCL. Topography of the reconstructed cover will mirror the existing configuration in accordance with the Site Management Plan. Following completion of GCL installation, the disturbed top surface of the Impoundment will be revegetated with native vegetation following procedures used previously at the Impoundment. Monitoring the establishment of vegetation will include continuation of the ongoing program of inspection and control of noxious weeds. The technical specifications for the GCL are attached hereto as Exhibit C.

8.      Pursuant to the Cover Construction Work Plan dated April 1, 2015, PacifiCorp estimates that the NALD – the "north anoxic limestone drain," a water-treatment mechanism – will generate approximately 350 cubic yards of spent limestone annually. SMA anticipates that the amount of spent limestone and/or frequency of limestone replacement will decrease each year after the top surface of the impoundment is capped with the GCL. The spent limestone that is generated by the NALD is to be deposited at the Impoundment beneath a reconstructed portion of the Impoundment's cover system. PacifiCorp plans to excavate topsoil from a portion of the cover system each year as necessary, deposit the limestone into that area on top of the GCL material, cover with additional GCL to encapsulate the limestone, and then replace the cover material.

9.      Construction of future repository areas on the top of the tailings impoundment will include removal of surface soil cover. The GCL will be exposed in the areas where material will be placed. Material will be placed in a manner that achieves positive drainage away from the area of material

placement. In the area where the limestone is placed, GCL will be placed over the limestone and sealed to the underlying GCL in accordance with the Cover Construction Work Plan dated April 1, 2015 (attached hereto as Exhibit A), and in concert with the

Development Permit Application – Addendum (attached hereto as Exhibit B). This replacement will include both Construction Quality Control and Construction Quality Assurance testing and documentation.

10.     PacifiCorp shall ensure, to the maximum extent feasible, that the integrity of the Cover System is restored to its original condition and meets the original design criteria after each time PacifiCorp excavates a section of the cover for deposition of the spent limestone. After placement of the encapsulation GCL and cover soil over the limestone, PacifiCorp shall verify that each section of new liner operates as it was intended to prevent migration of water into the tailings in accordance with ASTM Designation D6102-15, "Standard Guide for Installation of Geosynthetic Clay Liners." The Court shall retain limited jurisdiction, notwithstanding the termination of this Amended Consent Decree pursuant to Para. 20, to interpret and enforce the requirements of this Paragraph. SMA may file an appropriate motion with the Court if Plaintiff believes in good faith that PacifiCorp has violated the requirements of this paragraph, and PacifiCorp has failed, after notice by SMA of this alleged failure, to address the alleged failure.

### Supplemental Environmental Project

11.     PacifiCorp originally agreed to pay $150,000 for a Supplemental Environmental Project related to Priest Lake. *See* Original Consent Decree, ECF No. 42 at ¶ 16 and Ex. B. That project did not materialize due to, among other things, a reversal of position by the United States Fish and Wildlife Service. The funds have since been placed into escrow, and the Parties have agreed to a new Supplemental Environment Project in which the City of Telluride will be restoring

approximately 5,800 linear feet of the San Miguel River that was previously channelized. The principal goal of the restoration project is to return the river to its natural, meandering state across the Valley Floor Open Space. The restoration project will provide new riparian habitat, and improve overall river function by slowing flood flows, reducing erosion, providing nutrients to the floodplain, filtering flood waters, and helping rejuvenate areas along the river corridor. The Parties anticipate that the Supplemental Environmental Project funds will be expended by December 31, 2016. To the extent the river restoration project does not proceed as planned, the Parties agree to discuss the possibilities of a new Supplemental Environmental Project.

### Force Majeure

12.     A "Force Majeure Event" shall mean an event that has been or will be caused by circumstances beyond the control of PacifiCorp, its contractors, or any entity controlled by PacifiCorp or its contractors, that delays or prevents performance of any provision of this Amended Consent Decree despite the best efforts of PacifiCorp, its consultants, or any entity controlled by PacifiCorp, to fulfill the obligation. "Best efforts to fulfill the obligation" include using due diligence to anticipate any potential Force Majeure Event and to address the effects of any such event (a) as it is occurring and (b) after it has occurred, such that the delay or non-compliance is minimized to the greatest extent possible. Failure of a permitting authority to issue a necessary permit in a timely fashion may constitute a Force Majeure Event where PacifiCorp has taken all reasonable actions to obtain the permit by the time necessary to comply with any applicable deadlines established in this Amended Consent Decree. Such delay in or failure of performance occasioned by a Force Majeure Event shall not be deemed a violation of this Amended Consent Decree.

13.     If any event occurs or has occurred that may delay or prevent performance of any obligation under this Amended Consent Decree as to which PacifiCorp intends to assert a claim of Force Majeure, PacifiCorp shall notify SMA in writing as soon as practicable, but in no event later than ten (10) business days following the date PacifiCorp first knew of the claimed Force Majeure Event. In this notice, PacifiCorp shall describe the anticipated length of time that the delay or prevention of performance may persist, the cause or causes of the delay or prevention of performance, all measures taken or to be taken by PacifiCorp to prevent or minimize the delay or prevention of performance, the schedule by which PacifiCorp proposes to implement those measures, and PacifiCorp's rationale for attributing a delay or prevention of performance to a Force Majeure Event.

14.     SMA shall notify PacifiCorp in writing if it does not accept PacifiCorp's claim of Force Majeure within ten (10) days of receipt of the notice asserting the claim provided under Paragraph 18. Failure by SMA to provide such timely notice shall be deemed acceptance of the asserted Force Majeure claim. If the Parties agree that a delay in performance has been or will be caused by a Force Majeure Event, the Parties shall stipulate to an extension of deadline(s) for performance of the affected compliance requirement(s). In such circumstances, an appropriate modification shall be made pursuant to Paragraph 18.

15.     If SMA does not accept PacifiCorp's claim of Force Majeure, or if SMA and PacifiCorp cannot agree on the length of the delay actually caused by the Force Majeure Event, the matter shall be resolved in accordance with Paragraph 19.

### Resolution of Claims

16.     This Amended Consent Decree constitutes the exclusive remedy and final resolution between PacifiCorp and SMA, along with its members, officers, or directors, for all alleged

violations of the Clean Water Act set forth in the Complaint and sixty-day notices of intent to sue

sent by SMA to PacifiCorp on October 11, 2011 and January 13, 2012 ("60-Day Notices") that may

have occurred or that could have been raised prior to the entry of the original Consent Decree on

May 24, 2013.

17.     SMA releases and covenants not to sue PacifiCorp, and its directors, officers, employees,

and agents, with respect to any claims under the Clean Water Act or any other federal or state law

or regulation that were or could have been brought in this lawsuit arising from any act or omission

by PacifiCorp in regard to the Impoundment that occurred before the date the Court enters the

original Consent Decree, ECF No. 42. This release and covenant not to sue includes all such

claims, whether known or unknown, asserted or unasserted, and specifically includes claims for

damages, civil penalties, attorneys' fees and costs, expert consultant and witness fees, and

injunctive relief.

### Modification

18.     Modifications to this Consent Decree may be made only upon written agreement of the

Parties. Material modifications shall be effective only upon approval by the Court. Extension by

mutual agreement of the Parties of any deadline under this Amended Consent Decree by not more

than sixty (60) days is not a material modification and does not require Court approval.

### Dispute Resolution

19.     In the event of any dispute regarding implementation, interpretation, application, or

compliance with this Amended Consent Decree, the Parties shall first attempt to informally resolve

that dispute through meetings of the Parties. Any Party may initiate this informal dispute-

resolution process by serving written notice of a request for dispute resolution on the other Party.

If no resolution is reached within thirty (30) days from the date that the notice of a request for

dispute resolution is served, then the Parties may resolve the dispute by filing motions with the Court.

## Termination

20.     This Amended Consent Decree shall terminate upon the filing of a joint motion by the Parties that the Cover System has been successfully installed; provided, however, that the Court shall retain limited jurisdiction to enforce the requirements of Paragraphs 6 and 10 of this Amended Consent Decree.

## Miscellaneous Provisions

21.     By entering into the Amended Consent Decree, the Parties are not admitting any fact or conclusion of law, and this Amended Consent Decree shall not constitute an admission, statement, or evidence of any fact, wrongdoing, misconduct, or liability on the part of PacifiCorp, its owners, officers, agents, consultants, or affiliated entities.

22.     This Amended Consent Decree constitutes the final, complete, and exclusive agreement and understanding of the Parties with respect to the settlement embodied in this Amended Consent Decree and the subject matter of the Lawsuit. The Parties hereby acknowledge that there are no representations or understandings relating to the Lawsuit or its settlement other than those expressly contained in this Amended Consent Decree.

23.     In the event that any part of this Amended Consent Decree is deemed by a court of competent jurisdiction to be unlawful, void, or for any reason unenforceable, and if that part is severable from the remainder of the Amended Consent Decree without frustrating its essential purpose, then the remaining parts of this Amended Decree shall remain valid, binding, and enforceable.

24.     Each Party acknowledges and represents that it has relied on the legal advice of its attorneys, who are the attorneys of its own choice, and that the terms of this Amended Consent Decree have been completely explained to the Party by its attorneys, and that the terms are fully understood and voluntarily accepted. SMA has been represented by Charles M. Tebbutt and Daniel C. Snyder of the Law Offices of Charles M. Tebbutt, P.C. PacifiCorp has been represented by Andrew C. Lillie of Hogan Lovells US LLP.

25.     If for any reason the Court should decline to approve this Amended Consent Decree in the form presented, then the Parties agree to continue negotiations in good faith in an attempt to cure any objection raised by the Court to entry of this Decree.

26.     This Amended Consent Decree may be signed in counterparts, and such counterpart signature page shall be given full force and effect.

**Notices**

27.     Whenever notice is required to be given or a document is required to be sent by one Party to another under the terms of this Amended Consent Decree, it will be directed to the individuals at the addresses specified below, unless prior notice of a change has been given to the other Party. A notice is sufficient under this Amended Consent Decree if it is provided in writing through U.S. mail, hand-delivered, or provided electronically by e-mail with proof of delivery receipt certificate requested.  If notice is provided via U.S. mail, it shall be considered effective upon the date of mailing.

For Plaintiff SMA:

Daniel C. Snyder
Law Offices of Charles M. Tebbutt, P.C.
941 Lawrence St., Eugene OR 97401
Tel: (541) 344-3505
Fax: (541) 344-3516
dan@tebbuttlaw.com

For Defendant PacifiCorp:

Andrew C. Lillie
Hogan Lovells US LLP
One Tabor Center, Suite 1500
1200 Seventeenth Street
Denver, CO 80202
Tel: (303) 899-7300 Fax: (303) 899-7333
andrew.lillie@hoganlovells.com

And to:

Michael G. Jenkins
PacifiCorp Energy
1407 West North Temple, Suite 320
Salt Lake City, Utah 84121
michaeljenkins@pacificorp.com

## Effective Date

28.     The effective date of this Amended Consent Decree shall be the date upon which

the Clerk enters in the civil docket a copy of this Amended Consent Decree signed by the

Court.

WE HEREBY CONSENT to the Entry of this Amended Consent Decree.

DATED: January 4, 2016

BY THE COURT:

S/ Wiley Y. Daniel
WILEY Y. DANIEL
SENIOR UNITED STATES DISTRICT JUDGE

**For Plaintiff Sheep Mountain Alliance:**

Signature:

Leigh Robertson, Executive Director, Sheep Mountain Alliance

**Date:** 10/1/15

**For Defendant PacifiCorp:**

Signature:

Michael G. Jenkins, Assistant General Counsel,

PacifiCorp

Date: 10/1/15

# Exhibit A to Amended Consent Decree

# SILVER BELL TAILING IMPOUNDMENT

# COVER CONSTRUCTION WORKPLAN

# April 1, 2015

Prepared for:

**PacifiCorp**
1407 West North Temple, # 280
Salt Lake City, UT  84116

Prepared By:

**MWH Americas, Inc.**
2130 Resort Dr.
Suite 200
Steamboat Springs, Colorado 80487

 **MWH.**

# 1   INTRODUCTION

The Silver Bell Tailings Site (the "Site") owned by PacifiCorp consists of a reclaimed tailings impoundment (the "Impoundment") and related water-treatment system located in southwestern Colorado, approximately one-quarter mile west of the turnoff to the town of Ophir, Colorado, along Highway 145.

This document discusses a Cover Construction Plan for the Site. The main reclamation activities at the site were completed in 2000 through the Voluntary Cleanup Program (VCUP) directed by the Colorado Department of Public Health and Environment (CDPHE).   Recent efforts have been focused on the water treatment system associated with acid drainage from the northern portion of the impoundment as reported in the "2012 Construction Completion Report", and the "2014 Field Season Activities at the Silver Bell Site" (dated May 7, 2014).

# 2   SITE HISTORY

In May 1999, PacifiCorp submitted an application to the CDPHE entitled "Voluntary Cleanup and Redevelopment Act Application for Silver Bell Tailings Impoundment, Ophir, Colorado". Based on the approval of this application, PacifiCorp performed activities to both characterize and reclaim the Impoundment to achieve increased erosional and geotechnical stability of the tailings. The overall goal of the project was to reduce impacts from the Impoundment to surface water quality in Howard Fork of the San Miguel River. The activities were performed during 1999 and 2000 and included the following:

- Sediment and erosional control
- Consolidation of eroded tailings
- Tailings regrading
- Seepage drain installation
- Topsoil placement (as an evapotranspiration cover)
- Riprap placement
- Stormwater diversion channel construction
- Wetland construction
- Sediment pond construction
- Revegetation



Since the initial activities in 1999 and 2000 PacifiCorp has periodically upgraded the reclamation. In particular, they have helped ensure the stability of the eastern slope by constructing a retaining wall, and have completed numerous remedial items to both reduce seepage and improve the seepage treatment system. The focus of the 2012 construction activities was on the management of seepage from the Impoundment, particularly from the north toe of the Impoundment (i.e., the North Drain).

In June 2006, PacifiCorp formalized plans to install an Anoxic Limestone Drain (ALD) in the northwest stormwater pond. This location was designated the North ALD or "NALD."

PacifiCorp installed the NALD in early October 2006. This NALD was about 25 feet wide by 35 feet long with an average depth of about five feet. Construction of the NALD in the northwest pond included dewatering of the pond, installation of piping for collecting and delivering Impoundment seepage to the NALD, installation of a seepage distribution header in the pond bottom, filling of the NALD excavation with 1.5- to 2-inch crushed limestone, and installation of an outlet line. After placing the limestone in the NALD, PacifiCorp's contractors covered the limestone surface with a geotextile fabric and HDPE liner over which they placed locally available fill material.

PacifiCorp has collected pH and water quality data since that time to assess performance of the NALD and the overall discharge system. Those data show that the NALD increases the pH of the seepage passively from about 2.5 to typically greater than 6.0 (S.U.).

Since installation of the NALD, major upgrades have been made to the treatment system downstream from the NALD. Those upgrades include: improvements to the aeration channel; construction of an aeration basin; construction of multiple settling/treatment pond and treatment cells; rerouting of stormwater; and upgrades to the wetlands treatment unit and outfall structure. A treatment weir was also added to the discharge point.

In 2012, to construct a repository for material from the water treatment system, the cover topsoil was stripped in an area approximately three tenths (0.3) of an acre in the southeast corner of the Impoundment top surface and the topsoil was stockpiled. The stripped area then received the following: (1) the overburden, and subsequently the limestone from the existing NALD decommissioning; (2) the spent limestone and sediment from the treatment/wetlands ponds; and (3) other miscellaneous soils and sediments from around the treatment area. As a secondary objective, the placement of this material on the Impoundment was used to enhance the drainage off of the Impoundment cover in the southeastern corner of the Impoundment. The area had a history of run on and poor drainage. The area was graded to direct runoff to the east, toward Howard Fork, and to the southwest toward the Impoundment run-on ditch. This



configuration helps reduce the infiltration of water from snow accumulation in this area, or snowmelt run-on that occurs in the spring.

In addition to the regrading, a PVC liner was placed over the area to further reduce potential infiltration. The liner was placed on a 6-inch-thick bedding of crusher fines where rock was exposed in the material from the treatment area. In locations where the liner was placed directly on clean tailings, the bedding layer was not needed. The liner that was placed consisted of 60-mil PVC followed by another 6 inches of crusher fines to protect the liner from any rock in the cover soil.  The cover soil was then replaced. Because of a slightly larger 3D surface area and less than 100 percent of the soil cover being stripped, the average depth on the top soil is now approximately 14 inches deep. To limit infiltration, the topsoil no longer has to function as an evapotranspiration cover because of the inclusion of a synthetic liner. The topsoil now only functions as growth media for the grasses and forbs and the 14 inches of soil and 6 inches of crusher fines should be sufficient for revegetation. After placement of the cover soil, the area was revegetated.  A cross section of the typical liner construction is provided below.



## 3    COVER CONSTRUCTION PLAN

The Cover Construction Plan consists of covering the entire top surface of the Impoundment with a cover incorporating a synthetic liner, similar to what was used on the 2012 repository area for spent limestone.

The overall plan is to place a cover with a geosynthetic liner over the entire top of the Impoundment that will incorporate sufficient slope to promote surface water runoff as shown in Figure 1.

 **MWH.**

## 3.1   COVER CONSTRUCTION

Currently, the majority of the Impoundment is covered with a nominal two foot layer of topsoil material placed to perform as an evapo-transpiration cover.   In 2012, a repository was constructed in the eastern corner of the top surface for spent limestone material from the water management facility.  The cover over this repository was constructed incorporating a synthetic PVC liner in the cover system.  In 2015, the remaining impoundment top surface (excluding the impoundment side slopes) will be capped in a similar manner consistent with methods described below that were used in construction of the repository constructed in 2012.

Construction of the repository included stripping and stockpiling of the existing cover material, placement of spent materials directly on the tailings surface, followed by placement of a cover system over the material.  Cover system details for the repository are, from the spent material up, a layer of crusher fines rolled with a smooth drum roller to smooth surface for the liner material, which consists of an 8oz non-woven geotextile, a 60 mil PVC liner, and another 8oz non-woven geotextile.  On top of the upper layer of geotextile, another layer of crusher fines was placed and then a layer of topsoil at the surface.      The two non-woven geotextiles were placed as cushion layers to provide additional protection for the PVC liner material.  Seams in the liner material were made by overlapping the material at least 6 inches and sealing with LA4123 adhesive, a high solvent/adhesive.  For the repository, a layer of crusher fines was placed over the synthetic materials and then the final layer of topsoil was placed.  At the perimeter of the repository where future capping activities will tie into the cap system a row of plywood was placed to protect the geosynthetics during removal of the earthen materials for future expansion of the cap system.   Additional details on Closure of the Impoundment Repository are provided in the 2012 Construction Completion Report.

As part of the 2015 cover placement, the final cell on the Impoundment Repository will be constructed to contain spent materials from the water management system generated in 2014. This portion of the repository will tie into the northwest side of the current repository and extend along the edge of the top surface to the northwest as shown on Figure 1.  Based on preliminary surveys, it is anticipated that there will be approximately 350 cubic yards of material in this phase of the Impoundment Repository.

The cover system with liner will be extended to cover the top surface on the North side of the Impoundment that slopes toward Howard Fork during the 2015 construction season.  Drainage swales will be incorporated into the subgrade work in this area to direct any surface water away from the retaining wall at the toe of the slope.  The area to be covered and the approximate location of the drainage swales are shown on Figure 1.  Construction Quality Assurance (CQA) activities employed for the liner system are detailed in Appendix A.

 **MWH.**

In the future it is anticipated that spent material from the water management system will need to be consolidated on the top of the tailings impoundment. It is anticipated that approximately 250 cubic yards of material will be generated from the water treatment system for each phase of work. Areas for future spent material placement will be selected based on areas on the top surface that may need improvement (i.e., to improve drainage, improve cover plant growth, etc.). In each selected area, the cover material will be removed, the liner will be cut, and the material will be placed. The liner and cover material will then be replaced over the spent material, and the area will be replanted, in accordance with the top surface cover design. The spent material placement method will create a geomorphic top surface, rather than a flat top surface of the tailings impoundment.

The cover system to be placed over the North portion of the top surface will be constructed, generally in the same manner as the cover of the current repository. A typical section of the cover system is shown in the detail on Figure 1. Minor changes may be made for earthen material based on what is encountered or available; for instance, suitable subgrade might be achieved by rolling the underlying material for liner placement or salvage topsoil might be screened to remove coarse material so that it can be placed directly on the liner system.

The majority of the final top surface will be a planar surface as originally designed, except in the areas where spent material will be placed in the future, which will create a geomorphic top surface. The overall slope will remain toward the stormwater channel at the edge of the Impoundment. When the Impoundment is covered, it will be seeded with the approved site seed mix.

## 3.2   COVER CONSTRUCTION SCHEDULE

The anticipated schedule for completion of cover construction activities is during the 2015 construction season. This construction will result in the entire Impoundment surface area having a cover incorporating a synthetic liner designed to prevent infiltration. As stated above, the 2014 NALD system work generated approximately 350 cubic yards of material that will be covered as part of this cover placement.



 **MWH.**

## APPENDIX A – CONSTRUCTION QUALITY ASSURANCE PROGRAM

**Liner Inspection, Testing, and Evaluation of Liner during Installation and Earthworks CQA Monitoring**

PacifiCorp will provide observation and documentation of the geosynthetic liner installation and the underlying and overlying cushioning geotextiles. The construction quality control monitor (QCM) will be available to be on site throughout the liner installation.

At a minimum, the QCM will perform the activities listed below:

- Review geosynthetic quality control certifications
- Inventory geosynthetic deliveries
- Monitor deployment
- Monitor seaming
- Monitor non-destructive testing
- Monitor repair operations
- Track quantities
- Determine thickness of protective soil layers
- Inspect subgrade

The QCM will observe and document activities related to the quality assurance of the installation of the geosynthetic materials and underlying/overlying geotextile materials. The responsibility of the QCM will be to monitor, document, and photograph the construction of the liner. QC monitoring and documentation will be performed in order to document that construction of the liner adheres to standard liner installation performance criteria.

As one of our fundamental responsibilities, the QCM will prepare reports to document the work and to demonstrate compliance with the design documents. Specific reporting will include:

- Daily record keeping
- Field logbook reporting
- Final inspection report
- Weekly progress reports

Project documentation is achieved with well-maintained project files, documented and tracked official notifications, timely distributed meeting minutes, and complete and accurate progress reports.



An official project file will be created for the Silver Bell project. This file includes a "working file" where project personnel may review/check out documents to assist them in their work. A second file will hold all formal project documents and will be under the exclusive control of the project manager. Files will be organized according to project, task, and subtask. Disk copies of data, memorandum, and other written products are maintained in the files. Draft documents are purged and destroyed upon updating or issuing a final document.

The QCM will have several forms of project documentation. The QCM will record construction events as they occur in the individual's assigned field book, usually hour by hour during the shift. At the end of each shift, relevant sampling information will be placed in the project files. The QCM will then complete an "Inspector's Daily Report" summarizing the field book log. Example forms used in the CQA process are included at the end of this Appendix.

The project engineer will prepare weekly progress reports as a way of reviewing and concurring on daily reports, issues lists, field logbooks, database reports and analytical data reports. Progress reports will also be available to corroborate the final inspection report, and to document completed punch list items.

In addition to written documentation, construction photographs of the work remedial action will be taken by the QCM on a daily basis. Photographs of all aspects of the work, not just deficiencies, will be taken. A photograph of a deficiency will have a companion photograph of the corrected deficiency. A QCM photo log will be kept by the QCM and updated periodically during construction.

The photo log will contain the following information for each photograph:

- Photograph
- Photograph I.D.
- Date
- Photograph description

The photolog will be included with the certification report.

**Liner Certification Report**

At the end of construction MWH will prepare the liner certification report. The report will consist of the necessary documentation substantiating that specifications and design requirements have been met. The report will contain text, drawings, appendices, and a photo log. The text will describe items such as the work performed, contractors on site, equipment used, approved change orders, CQC sampling and analysis, deficiencies, and resolutions. The appendices will



contain summary spreadsheets of testing and analytical data that are well organized and concise with actual completed forms and analytical data for backup.

# CERTIFICATE OF ACCEPTANCE OF SOIL SURFACE

PROJECT NUMBER:_____     PROJECT NAME: _____

OWNER:_____     LOCATION:_____

**GEOSYNTHETICS CONTRACTOR:**

I, the Undersigned, the duly authorized representative of _____, have visually observed the soil subgrade surface described below, and found it to be an acceptable surface on which to install geomembrane.

This certificate is based on observations of the surface of the subgrade only. No subterranean inspection or tests have been performed by_____, and makes no representations or warranties regarding conditions which may exist below the surface of the subgrade. _____shall be responsible for subgrade surface upon acceptance of any given area. _____ accepts no responsibility for conformance of the subgrade to this project's specification.

Area being accepted:

_____

_____

_____

| | | | |
|---|---|---|---|
| NAME | SIGNATURE | TITLE | DATE |

**CERTIFICATE OF ACCEPTANCE RECEIVED BY QA/QC MANAGER**

| | | | |
|---|---|---|---|
| NAME | SIGNATURE | TITLE | DATE |

**CERTIFICATE OF ACCEPTANCE RECEIVED BY OWNER**

| | | | |
|---|---|---|---|
| NAME | SIGNATURE | TITLE | DATE |

# GEOMEMBRANE PANEL DEPLOYMENT LOG

DATE:_____

SHEET_____ OF _____

PROJECT NUMBER:_____     PROJECT NAME: _____

OWNER:_____     LOCATION:_____

CONTRACTOR:_____

GEOMEMBRANE:    POND         OTHER: _____

SUBGRADE/SUBSURFACE CONDITION:_____

REMARKS:_____

| DESCRIPTION | PANEL NUMBER | | | | PANEL NUMBER | | | | PANEL NUMBER | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ROLL NUMBER | | | | | | | | | | | | |
| DEPLOYED LENGTH | | | | | | | | | | | | |
| AMBIENT AIR TEMP | | | | | | | | | | | | |
| VISUAL OBSERVATION | | | | | | | | | | | | |
| OBSERVED OVERLAP | | | | | | | | | | | | |
| MONITOR | | | | | | | | | | | | |
| REMARKS | | | | | | | | | | | | |
| SHEET THICKNESS | LEAD | L SIDE | R SIDE | TRIAL | LEAD | L SIDE | R SIDE | TRIAL | LEAD | L SIDE | R SIDE | TRIAL |
| (MILS) | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| AVERAGE | | | | | | | | | | | | |

| DESCRIPTION | PANEL NUMBER | | | | PANEL NUMBER | | | | PANEL NUMBER | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ROLL NUMBER | | | | | | | | | | | | |
| DEPLOYED LENGTH | | | | | | | | | | | | |
| AMBIENT AIR TEMP | | | | | | | | | | | | |
| VISUAL OBSERVATION | | | | | | | | | | | | |
| OBSERVED OVERLAP | | | | | | | | | | | | |
| MONITOR | | | | | | | | | | | | |
| REMARKS | | | | | | | | | | | | |
| SHEET THICKNESS | LEAD | L SIDE | R SIDE | TRIAL | LEAD | L SIDE | R SIDE | TRIAL | LEAD | L SIDE | R SIDE | TRIAL |
| (MILS) | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| AVERAGE | | | | | | | | | | | | |

REVIEWED BY_____ DATE_____

# GEOMEMBRANE DEFECT LOG

DATE:_____                           SHEET_____ OF _____

PROJECT NUMBER:_____          PROJECT NAME: _____

OWNER:_____          LOCATION:_____

REMARKS:_____

| DEFECT CODE | DEFECT LOCATION | | DEFECT TYPE | LOG DATE | MON | REMARKS | REPAIR DATE* | TEST DATE * |
|---|---|---|---|---|---|---|---|---|
| | SEAM, PANEL OR REPAIR NO. | DEFECT LOCATION DESCRIPTION | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |

| | | | | | | |
|---|---|---|---|---|---|---|
| AD | ANIMAL RELATED DAMAGE | EE | EARTHWORKS DAMAGE | PT | PRESSURE TEST CUT |
| B | UNDISPERSED RESIN BEAD | EXT | EXTENSION | SI | SOIL IRREGULARITY |
| BO | FUSION WELDER BURN | FM | FISHMOUTH | SL | SLAG ON TEXTURED SHEET |
| BS | BOOT/SKIRT FOR FML PENETRATION | FS | FAILED SEAM LENGTH | T | THREE PANEL INTERSECTION |
| CO | CHANGE OF OVERLAP | FTS | FIELD TEST STRIP | VL | VACUUM TEST LEAK |
| CR | CREASE | MT | HEAT TRACK BURN | WR | WRINKLE |
| D | INSTALLATION DAMAGE | IO | INSUFFICIENT OVERLAP (UNDER SPEC) | WS | WELDER RESTART |
| DS-# | DESTRUCTIVE TEST NUMBER | MO | MANUFACTURER/DELIVERY DAMAGE | OTHER | |

NOTE: * COLUMNS TO BE USED BY THE DATA REVIEWER ONLY

REVIEWED BY:_____ DATE_____

# GEOMEMBRANE SEAM VACUUM TEST LOG

DATE: _____

OWNER: _____

LOCATION: _____

SHEET _____ OF _____

PROJECT NUMBER: _____

PROJECT NAME: _____

INSTALLER: _____

AREA: _____

| SEAM NUMBER* | SEAM SECTION ** FROM / TO | DEFECT CODE | CQA MON ID | TECH ID | GAUGE # | DEFECTS*** | SEAM COMPLETE NO / YES | OBS TEST | REMARKS |
|---|---|---|---|---|---|---|---|---|---|
| / | - | | | | | | / | | |
| / | - | | | | | | / | | |
| / | - | | | | | | / | | |
| / | - | | | | | | / | | |
| / | - | | | | | | / | | |
| / | - | | | | | | / | | |
| / | - | | | | | | / | | |
| / | - | | | | | | / | | |
| / | - | | | | | | / | | |
| / | - | | | | | | / | | |
| / | - | | | | | | / | | |
| / | - | | | | | | / | | |
| / | - | | | | | | / | | |
| / | - | | | | | | / | | |

* Indicate seam number by two adjacent panel numbers, with the lowest panel number indicated first and proper layer (i.e., Tertiary, Secondary Primary).
** Reference seam endpoints from an End of Seam (EOS), a repair number or a point location on the seam (i.e., Reference point, distance from reference point).
*** Record quantity of leaks detected and reference new defect code in remarks column.

REVIEWED BY _____ DATE _____

# GEOMEMBRANE SEAM PRESSURE TEST LOG

DATE: _____

OWNER: _____

LOCATION: _____

SHEET ____ OF ____

PROJECT NUMBER: _____

PROJECT NAME: _____

INSTALLER: _____

AREA: _____

| SEAM NUMBER* | SEAM SECTION** FROM / TO | TECH ID | GAUGE # | COA MON ID | START TIME | FINISH TIME | INITIAL PRESS. | FINAL PRESS. | PRESSURE DIFF | PASS/ FAIL | OBS TEST Y/N | ENTIRE SEAM COMPLETE NO | YES | REMARKS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| / | / | | | | | | | | | | | | | |
| / | / | | | | | | | | | | | | | |
| / | / | | | | | | | | | | | | | |
| / | / | | | | | | | | | | | | | |
| / | / | | | | | | | | | | | | | |
| / | / | | | | | | | | | | | | | |
| / | / | | | | | | | | | | | | | |
| / | / | | | | | | | | | | | | | |
| / | / | | | | | | | | | | | | | |
| / | / | | | | | | | | | | | | | |
| / | / | | | | | | | | | | | | | |
| / | / | | | | | | | | | | | | | |
| / | / | | | | | | | | | | | | | |
| / | / | | | | | | | | | | | | | |
| / | / | | | | | | | | | | | | | |
| / | / | | | | | | | | | | | | | |
| / | / | | | | | | | | | | | | | |
| / | / | | | | | | | | | | | | | |

* Indicate seam number by two adjacent panel numbers, with the lowest panel number indicated first.

** Reference seam endpoints from an End of Seam (EOS), a defect repair number or a point location on the seam (reference point, distance from reference point).

APPROVED GAUGE:

# Exhibit B to Amended Consent Decree

Development Permit Application - Addendum

This addendum presents additional information submitted by PacifiCorp for 2015 cover work at the Silver Bell Tailings Impoundment.

As a part of an agreement being finalized with Sheep Mountain Alliance, PacifiCorp will be installing a Geosynthetic Clay Liner (GCL) in the cover of the tailings impoundment top surface in 2015. The process for the GCL placement will be removal of the topsoil from the existing cover, preparation of the subgrade for GCL placement, placement for the GCL barrier layer followed by replacement of the topsoil. Topsoil removed from the surface in the initial step may be screened to remove coarse material so that it can be placed directly on the GCL material. Topography of the reconstructed cover will mirror the existing configuration in accordance with the Site Management Plan.

Following completion of cover work, the disturbed top surface of the tailings impoundment will be revegetated in following procedures used previously at the site. Monitoring the establishment of site vegetation will include continuation of the ongoing program of inspection and control of noxious weeds.

***Repository Construction***

In the future it is anticipated that spent material from the water management system will need to be consolidated on the top of the tailings impoundment. It is anticipated that approximately 250 cubic yards of material will be generated from the water treatment system for each phase of work. Areas for future spent material placement will be selected based on areas on the top surface that may need improvement (i.e., to improve drainage, improve cover plant growth, etc.). In each selected area, the topsoil cover material will be removed to expose the GCL material and the spend limestone material will be placed. The liner and topsoil cover material will then be replaced over the spent material with the cover GCL material sealed to the base GCL material using granular bentonite. In this way the spent material from the water treatment system will be entirely encapsulated. Following replacement of the topsoil each repository area will be replanted, in accordance with the top surface cover design. The spent material placement method will create a geomorphic top surface, rather than a flat top surface of the tailings impoundment.

Storm water management at the site during 2015 activities will follow the Construction Stormwater Management Permit maintained by Skanska, the contractor performing cover work.

# Exhibit C to Amended Consent Decree



# BENTOMAT® CL

# GEOSYNTHETIC CLAY LINER SPECIFICATION GUIDELINES

This specification is intended for use as a **GENERAL GUIDELINE** for developing a specification for a specific project.  It is NOT intended as a substitute for a detailed specification, which must be written to address site-specific conditions.

+44 (0)151 606 5900 Fax +44 (0)151 606 5932

For the most up-to-date product information, please visit our website, www.cetco.com.

A wholly owned subsidiary of AMCOL International Corporation. The information and data contained herein are believed to be accurate and reliable, CETCO makes no warranty of any kind and accepts no responsibility for the results obtained through application of this information.

## 1.0   GENERAL

### 1.1   Scope

This specification covers the technical requirements for the furnishing and installation of the geosynthetic clay liner described herein. All materials used shall meet the requirements of this specification, and all work shall be performed in accordance with the procedures provided herein and the contract drawings.

### 1.2   Definitions

For the purposes of this specification guideline, the following terms are defined below:

Geosynthetic Clay Liner (GCL) A manufactured hydraulic barrier consisting of clay bonded to a layer or layers of geosynthetics.

Geomembrane   An essentially impermeable geosynthetic composed of one or more geosynthetic sheets.

Geotextile  Any permeable geosynthetic comprised solely of textiles.

Minimum Average Roll Value  For geosynthetics, the value calculated as the typical value minus two (2) standard deviations from documented quality control test results for a defined population from one specific test method associated with one specific property.

Overlap  Where two adjacent GCL panels contact, the distance measuring perpendicular from the overlying edge of one panel to the underlying edge of the other.

### 1.3   Unit Prices

Measurement will be made of the total surface area in square metres covered by the GCL as shown on the contract drawings. Final quantities will be based on as-built conditions. Allowance will be made for GCL in anchor and drainage trenches but no allowance will be made for waste, overlap, or materials used for the convenience of the Contractor. GCL installed and accepted will be paid for at the respective contract unit price in the bidding schedule.

### 1.4   Submittals

A.     With the bid, the Contractor shall furnish the following information:

   1.   Conceptual description of the proposed plan for placement of the GCL panels over the area of installation.
   2.   GCL manufacturer's MQC Plan for documenting compliance to Sections 2.1 and 2.2 of these specifications.
   3.   GCL manufacturer's historical data for multi-axial tension testing of the laminated GCL per Section 2.1E.
   4.   A copy of GCL manufacturer's ISO quality Certificate of Registration.

+44 (0)151 606 5900 Fax +44 (0)151 606 5932

For the most up-to-date product information, please visit our website, www.cetco.com.

A wholly owned subsidiary of AMCOL International Corporation. The information and data contained herein are believed to be accurate and reliable, CETCO makes no warranty of any kind and accepts no responsibility for the results obtained through application of this information.

B.   At the Engineer's or Owner's request the Contractor shall furnish:

1.   A representative sample of the GCLs.
2.   A project reference list for the GCL(s) consisting of the principal details of at least ten projects totaling at least 100,000 square metres in size.

C.   Upon shipment, the Contractor shall furnish the GCL manufacturer's Quality Assurance/Quality Control (QA/QC) certifications to verify that the materials supplied for the project are in accordance with the requirements of this specification.

D.   As installation proceeds, the Contractor shall submit certificates of subgrade acceptance, signed by the Contractor and CQA Inspector (see Sections 1.6 and 3.3) for each area that is covered by the GCL.

## 1.5   Qualifications

A.   GCL Manufacturer must have produced at least 30 million square metres of GCL within the past three years, including at least 3 million square metres with 65 N/10cm peel strength.

B.   The GCL Installer must either have installed at least 100,000 square metres of GCL, **or** must provide to the Engineer satisfactory evidence, through similar experience in the installation of other types of geosynthetics, that the GCL will be installed in a competent, professional manner.

## 1.6   Construction Quality Assurance (CQA)

A.   The Owner and Engineer shall provide a third-party inspector for CQA of the GCL installation.  The inspector shall be an individual or company who is independent from the manufacturer and installer, who shall be responsible for monitoring and documenting activities related to the CQA of the GCL, throughout installation.  The inspector shall have provided CQA services for the installation of the proposed or similar GCL for at least 5 completed projects totaling not less than 100,000 square metres.

B.   Testing of the GCL, as necessary to support the CQA effort, shall be performed by a third party laboratory retained by the Contractor and independent from the GCL manufacturer and installer.  The laboratory shall have provided GCL CQA testing of the proposed or similar GCL for at least 5 completed projects totaling not less than 100,000 square metres.

C.   CQA shall be provided in accordance with the *GCL CQA Manual* provided by the engineer.

+44 (0)151 606 5900 Fax +44 (0)151 606 5932
For the most up-to-date product information, please visit our website, www.cetco.com.
A wholly owned subsidiary of AMCOL International Corporation. The information and data contained herein are believed to be accurate and reliable, CETCO makes no warranty of any kind and accepts no responsibility for the results obtained through application of this information.

## 2.0   PRODUCTS

A.   The GCL shall consist of a layer of granular sodium bentonite clay needlepunched between two geotextiles and laminated to a thin flexible membrane liner (Bentomat CL). The GCL shall comply with all of the criteria listed in this Section.

B.   Bentonite shall be a high-swelling sodium bentonite, with a minimum swell index of 24 mL/2g and a maximum fluid loss of 18 mL.

C.   Bentonite shall have a granular consistency (15 percent max. passing a No. 200 sieve [75 μm]), to ensure uniform distribution throughout the GCL and minimal edge loss during handling and installation.

D.   Prior to using an alternate GCL, the Contractor must furnish independent test results demonstrating that the proposed alternate material meets all requirements of this specification.  Contractor must also provide evidence of successful use of the proposed alternate material on past similar projects.  This evidence can include past direct shear results against similar materials under similar site conditions, and/or past permeability/compatibility test results with a similar leachate or waste stream. The Contractor also must obtain prior approval of the alternative GCL by the Project Engineer.

## 2.1   Materials

A.   Acceptable GCL product is Bentomat CL, as manufactured by CETCO Limited or an engineer-approved equal.

B.   The GCL and its components shall have the properties shown in the Bentomat CL Certified Properties table.

C.   The moisture content of the bentonite in the finished GCL shall be between 20 and 40 percent, to ensure uniform bentonite distribution, consistent needlepunch density, and adequate electrical conductivity to maximize leak location survey sensitivity.

D.   GCL shall be needlepunch-reinforced, with a minimum peel strength of 65 N/10cm.  To maximize large-displacement shear strength, GCL reinforcement shall be achieved solely through needlepunching, without any supplemental heat treatment.

## 2.2   Product Quality Documentation

The GCL manufacturer shall provide the Contractor or other designated party with manufacturing QA/QC certifications for each shipment of GCL.  The certifications shall be signed by a responsible party employed by the GCL manufacturer and shall include:

A.   Certificates of analysis for the bentonite clay used in GCL production demonstrating compliance with the swell index and fluid loss values shown in the Bentomat CL Certified Properties table.

+44 (0)151 606 5900 Fax +44 (0)151 606 5932

For the most up-to-date product information, please visit our website, www.cetco.com.

A wholly owned subsidiary of AMCOL International Corporation. The information and data contained herein are believed to be accurate and reliable, CETCO makes no warranty of any kind and accepts no responsibility for the results obtained through application of this information.

B.    Manufacturer's test data for finished GCL product(s) demonstrating compliance with the values shown in the Bentomat CL Certified Properties table.

C.    GCL lot and roll numbers supplied for the project (with corresponding shipping information).

## 2.3    Product Labeling

A.    Prior to shipment, the GCL manufacturer shall label each roll, identifying:

    1.    Product identification information (Manufacturer's name and address, brand product code).

    2.    Lot number and roll number.

    3.    Roll length, width and weight.

## 2.4    Packaging

A.    The GCL shall be wound around a rigid core whose diameter is sufficient to facilitate handling.  The core is not necessarily intended to support the roll for lifting but should be sufficiently strong to prevent collapse during transit.

B.    All rolls shall be labeled and bagged in packaging that is resistant to photo degradation by ultraviolet (UV) light.

+44 (0)151 606 5900 Fax +44 (0)151 606 5932

For the most up-to-date product information, please visit our website, www.cetco.com.

A wholly owned subsidiary of AMCOL International Corporation. The information and data contained herein are believed to be accurate and reliable, CETCO makes no warranty of any kind and accepts no responsibility for the results obtained through application of this information.



**LINING TECHNOLOGIES**
Certified Properties

## BENTOMAT® CL CERTIFIED PROPERTIES

| MATERIAL PROPERTY | ANALYSIS CONDUCTED BASED ON TEST METHOD | TEST FREQUENCY | REQUIRED VALUES |
|---|---|---|---|
| Bentonite Swell Index[2] | ASTM D 5890 | 10,000 $m^2$ | 24ml / 2g min. |
| Bentonite Mass per unit Area[3] | ASTM D 5993/EN 14196 | 5,000 $m^2$ | 4.0 kg/$m^2$ |
| Bentonite Fluid Loss | ASTM D 5891 | 10,000 $m^2$ | 18 ml max. |
| GCL Peel Strength | ASTM D 6496 | 5,000 $m^2$ | 65 N |
| GCL Index Flux | ASTM D 5887 | 25,000 $m^2$ | No Observable Flow |
| GCL Permeability | ASTM D 5887 | 25,000$m^2$ | No Observable Flow |
| Tensile Strength[1] | EN ISO 10319 | 20,000 $m^2$ | 8 kN/m |
| Elongation | EN ISO 10319 | 20,000 $m^2$ | 15 percent typical |
| Mass per unit area of woven geotextile | ASTM D 5261 | 1 per 20,000 $m^2$ | 100 g/$m^2$ |
| Mass per unit area of (non woven) needle-punched geotextiles | ASTM D 5261 | 1 per 20,000 $m^2$ | 200 g/$m^2$ |
| Mass per unit area of flexible Membrane liner | ASTM D 5261 | 1 per 20,000 $m^2$ | 160 g/$m^2$ |

*Bentomat ® CL is a reinforced GCL consisting of a layer of natural sodium Bentonite between a woven and a non-woven geotextile which are needle-punched together and laminated to a thin flexible membrane liner.*

Notes:

[1]   All tensile testing is performed in the machine direction.
[2]   Bentonite properties as removed from the finished GCL.
[3]   Bentonite mass/area reported at 12 percent moisture.

+44 (0)151 606 5900 Fax +44 (0)151 606 5932
For the most up-to-date product information, please visit our website, www.cetco.com.
A wholly owned subsidiary of AMCOL International Corporation. The information and data contained herein are believed to be accurate and reliable, CETCO makes no warranty of any kind and accepts no responsibility for the results obtained through application of this information.

**2.5**     **Accessory Bentonite**

A.     The granular bentonite sealing clay used for overlap seaming, penetration sealing and repairs shall be made from the same natural sodium bentonite as used in the GCL and shall be as recommended by the GCL manufacturer. Seaming of GCLs shall be conducted in accordance with the manufacturer's specifications for each particular GCL. Please refer to the installation guidelines for Bentomat GCLs.

**3.0**     **EXECUTION**

**3.1**     **Shipping and Handling**

A.     The manufacturer assumes responsibility for initial loading the GCL. Shipping will be the responsibility of the party paying the freight. Unloading, on-site handling and storage of the GCL are the responsibility of the Contractor, Installer or other designated party.

B.     A visual inspection of each roll should be made during unloading to identify if any packaging has been damaged. Rolls with damaged packaging should be marked and set aside for further inspection. The packaging should be repaired prior to being placed in storage.

C.     The party responsible for unloading the GCL should contact the Manufacturer prior to shipment to ascertain the appropriateness of the proposed unloading methods and equipment.

**3.2**     **Storage**

A.     Storage of the GCL rolls shall be the responsibility of the installer. A dedicated storage area shall be selected at the job site that is away from high traffic areas and is level, dry and well drained.

B.     Rolls should be stored in a manner that prevents sliding or rolling from the stacks and may be accomplished by the use of chock blocks. Rolls should be stacked at a height no higher than that at which the lifting apparatus can be safely handled (typically no higher than four).

C.     All stored GCL materials and the accessory bentonite must be covered with a plastic sheet or tarpaulin until their installation.

D.     The integrity and legibility of the labels shall be preserved during storage.

**3.3**     **Earthwork**

A.     Any earthen surface upon which the GCL is installed shall be prepared and compacted in accordance with the project specifications and drawings.

+44 (0)151 606 5900 Fax +44 (0)151 606 5932

For the most up-to-date product information, please visit our website, www.cetco.com.

A wholly owned subsidiary of AMCOL International Corporation. The information and data contained herein are believed to be accurate and reliable, CETCO makes no warranty of any kind and accepts no responsibility for the results obtained through application of this information.

B.   If the GCL is placed over an earthen subgrade, the surface must be compacted to at least 90 percent modified Proctor density or to the extent required by the project specifications.   Engineer's approval of the subgrade must be obtained prior to installation. The finished surface must be firm and unyielding, without abrupt elevation changes, voids, cracks, ice or standing water.

C.   The subgrade surface must be free of vegetation, sharp-edged rocks, stones, sticks, construction debris and other foreign material that could contact the GCL. The subgrade should be rolled with a smooth-drum compactor to remove any wheel ruts, footprints or other abrupt grade changes. Furthermore, all protrusions extending more than 12mm from the subgrade surface shall either be removed, crushed or pushed into the surface with a smooth-drum compactor. The GCL may be installed on a frozen subgrade, but the subgrade soil in the unfrozen state should meet the above requirements.

D.   On a continuing basis, the project CQA inspector shall certify acceptance of the subgrade before GCL placement.

E.   It shall be the installer's responsibility thereafter to indicate to the Engineer any change in the condition of the subgrade that could cause the subgrade to be out of compliance with any of the requirements listed in this Section.

F.   At the top of sloped areas of the job site, an anchor trench for the GCL shall be excavated or an equivalent runout shall be utilized in accordance with the project plans and specifications and as approved by the CQA Inspector.   When utilizing an anchor trench design, the trench shall be excavated and approved by the CQA Inspector prior to GCL placement. No loose soil shall be allowed at the bottom of the trench and no sharp corners or protrusions shall exist anywhere within the trench.

## 3.4    GCL Placement

A.   The areas to be lined with GCL shall be agreed upon by the Installer and the Engineer prior to installation.

B.   GCL rolls should be delivered to the working area of the site in their original packaging. Immediately prior to deployment, the packaging should be carefully removed without damaging the GCL. The orientation of the GCL (i.e., which side faces up) should be in accordance with the Engineer's recommendations.

C.   Equipment, which could damage the GCL, shall not be allowed to travel directly on it. If the installation equipment causes rutting of the subgrade, the subgrade must be restored to its originally accepted condition before placement continues.

D.   Care must be taken to minimize the extent to which the GCL is dragged across the subgrade in order to avoid damage to the bottom surface of the GCL. A temporary geosynthetic subgrade covering commonly known as a slip sheet or rub sheet may be used to reduce friction damage during placement.

E.   The GCL panels shall be placed parallel to the direction of the slope.

+44 (0)151 606 5900 Fax +44 (0)151 606 5932

For the most up-to-date product information, please visit our website, www.cetco.com.
A wholly owned subsidiary of AMCOL International Corporation. The information and data contained herein are believed to be accurate and reliable, CETCO makes no warranty of any kind and accepts no responsibility for the results obtained through application of this information.

F.     All GCL panels should lie flat on the underlying surface, with no wrinkles or fold, especially at the exposed edges of the panels.

## 3.5   Anchorage

A.     As directed by the project drawings and specifications, the end of the GCL roll shall be placed in an anchor trench at the top of the slope or an equivalent runout design shall be utilized.  When utilizing an anchor trench design, the front edge of the trench should be rounded so as to eliminate any sharp corners.  Loose soil should be removed from the floor of the trench.  The GCL should cover the entire trench floor but does not extend up the rear trench wall.

## 3.6   Seaming

A.     The GCL seams are constructed by overlapping their adjacent edges.  Care should be taken to ensure that the overlap zone is not contaminated with loose soil or other debris. Bentonite-enhanced seams are required for installation of membrane-laminated GCLs.

B.     The minimum dimension of the longitudinal overlap for Bentomat CL should be 150 mm. End-of-roll overlapped seams should be similarly constructed, but the minimum overlap should measure 300 mm.

C.     Seams at the ends of the panels should be constructed such that they are shingled in the direction of the grade to prevent the potential for runoff flow to enter the overlap zone.

D.     Bentonite-enhanced seams are constructed between the overlapping adjacent panels described above. The underlying edge of the longitudinal overlap is exposed and then a continuous bead of granular sodium bentonite is applied within the zone defined by the edge of the underlying panel and the 150 mm line.  A similar bead of granular sodium bentonite is applied at the end-of-roll overlap.  The granular bentonite shall be applied at a minimum application rate of 0.4 kg/m.

## 3.7   Detail Work

A.     The GCL shall be sealed around penetrations and embedded structures embedded in accordance with the design drawings and the GCL Manufacturer.

B.     Cutting the GCL should be performed using a sharp utility knife.  Frequent blade changes are recommended to avoid damage to the geotextile components of the GCL during the cutting process.

## 3.8   Damage Repair

+44 (0)151 606 5900 Fax +44 (0)151 606 5932

For the most up-to-date product information, please visit our website, www.cetco.com.

A wholly owned subsidiary of AMCOL International Corporation. The information and data contained herein are believed to be accurate and reliable, CETCO makes no warranty of any kind and accepts no responsibility for the results obtained through application of this information.

A.   If the GCL is damaged (torn, punctured, perforated, etc.) during installation, it may be possible to repair it by cutting a patch to fit over the damaged area.  The patch shall be obtained from a new GCL roll and shall be cut to size such that a minimum overlap of 300 mm is achieved around all of the damaged area.  Granular bentonite or bentonite mastic should be applied around the damaged area prior to placement of the patch.   It may be desirable to use an adhesive to affix the patch in place so that it is not displaced during cover placement.

## 3.9   Cover Placement

A.   Cover soils shall be free of large stones or other foreign matter that could damage the GCL.  Cover soils should be approved the project Engineer with respect to particle size, uniformity and chemical compatibility.  Cover soils with high concentrations of calcium (e.g., limestone, dolomite) are not acceptable.

B.   Soil cover shall be placed over the GCL using construction equipment that minimizes stresses on the GCL.  A minimum thickness of 300 mm of cover should be maintained between the equipment tires/tracks and the GCL at all times during the covering process.  This thickness recommendation does not apply to frequently trafficked areas or roadways, for which a minimum thickness of 600 mm is required.

C.   Soil cover should be placed in a manner that prevents the soil from entering the GCL overlap zones.  Cover soil shall be pushed up slopes, not down slopes, to minimize tensile forces on the GCL.

D.   Although direct vehicular contact with the GCL is to be avoided, lightweight, low ground pressure vehicles (such as 4-wheel all-terrain vehicles) may be used to facilitate the installation of any geosynthetic material placed over the GCL.  The GCL supplier or CQA engineer should be contacted with specific recommendations on the appropriate procedures in this situation.

+44 (0)151 606 5900 Fax +44 (0)151 606 5932

For the most up-to-date product information, please visit our website, www.cetco.com.

A wholly owned subsidiary of AMCOL International Corporation. The information and data contained herein are believed to be accurate and reliable, CETCO makes no warranty of any kind and accepts no responsibility for the results obtained through application of this information.